## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
In re:                                        :          Chapter 15
                                              :
Kraus Carpet Inc., et al.,¹                   :          Case No. 18-12057 (___)
                                              :
      Debtors in a Foreign Proceeding.        :          Joint Administration Pending
                                              :
-------------------------------------------------------x
```

### DECLARATION OF CHRISTOPHER EMMOTT IN SUPPORT OF (A) MOTION OF FOREIGN REPRESENTATIVE FOR ENTRY OF PROVISIONAL AND FINAL ORDERS GRANTING RECOGNTION OF FOREIGN MAIN PROCEEDING AND (B) OTHER FIRST DAY RELIEF

I, Christopher Emmott, declare as follows:

1.      I am a director of Kraus Carpet Inc. ("KCI").  KCI is the duly authorized foreign representative of Kraus USA Inc. ("Kraus US"), Strudex Inc., KCI, Kraus Properties Inc., Kraus Canada Ltd., and Kraus Brands Inc. (collectively, the "Debtors"), in a Canadian Proceeding (the "CCAA Proceeding") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") pending before the Ontario Superior Court of Justice (the "Canadian Court").  The CCAA Proceeding was commenced on September 10, 2018 and, on September 11, 2018, the Canadian Court entered its Initial Order (the "CCAA Order") granting the Debtors certain relief under the CCAA and appointing KCI as the "foreign representative" authorized to apply for recognition of the CCAA Proceeding as a foreign proceeding within the United States. KCI is a corporation.

---

¹       The Debtors in these chapter 15 cases and the last four digits of each Debtor's U.S. tax identification number or Canadian Business Number, as applicable, are as follows:  Kraus USA Inc. (USA) (1024); Strudex Inc. (0906); Kraus Carpet Inc. (8687); Kraus Properties Inc. (1102); Kraus Canada Ltd. (1300); and Kraus Brands Inc. (8885).  The Debtors' mailing address for purposes of these chapter 15 cases is 65 Northfield Drive West, Waterloo, Ontario, Canada.

2.      On the date hereof, the above captioned chapter 15 cases (the "Chapter 15 Cases")
were commenced by the Foreign Representative's filing of a verified voluntary *Chapter 15 Petition for Recognition of a Foreign Proceeding* for each Debtor and a *Motion for Provisional and Final Orders Granting Recognition of Foreign Main Proceeding and Certain Related Relief* (collectively, the "Petition for Recognition") seeking (i) entry of a provisional and final order recognizing the CCAA Proceeding as a foreign main proceeding and (ii) granting related relief. Deloitte Restructuring Inc. (the "Monitor") has been appointed as monitor of the Debtors in the CCAA Proceeding.

3.      This declaration is filed in support of the Petition for Recognition and other "first day" relief requested by the Foreign Representative.

## I.      **Background**

### A.      **Kraus Group Operations**

4.      The Kraus brand dates back to 1959 when Michael Kraus established the company as a manufacturer of carpets in Kitchener, Ontario. Over the years the Kraus Group gradually expanded distribution, operations, and range of products, growing to become one of North America's largest flooring companies.

5.      The "Kraus Group" consists of the Debtors and certain non-debtor affiliates.  It currently has two divisions: (i) the manufacturing of residential and commercial broadloom carpet division ("Broadloom Business"); and (ii) the "trading product sales" division which involves the distribution and sale of flooring products to commercial and residential customers, including carpet tiles, vinyl tiles, laminate, and hardwood  ("TPS Business").  The Broadloom Business accounts for approximately 46% of the Kraus Group's revenues; the TPS Business accounts for the remaining 54%.

28664888.3

6.     The registered office for each Debtor (other than Kraus US) is 65 Northfield Drive West, Waterloo, Ontario (the "Waterloo Premises").  Control of the Kraus Group's operations is at the Waterloo Premises where main production occurs and where the management of the Kraus Group is headquartered.

7.     Kraus US is a Delaware corporation that operates the US carpet and flooring distribution network for the United States.   Kraus US does not perform any manufacturing.

## II.     Kraus Group's Debt and Security Structure

### A.     Senior Secured Debt

8.     Wells Fargo Capital Finance Corporation Canada ("Wells Fargo") is the senior secured lender to the Kraus Group.  Pursuant to a credit agreement dated August 6, 2013 ("Wells Credit Agreement"), Wells Fargo provided three credit facilities to Kraus Canada LP, Strudex LP, Kraus Carpet LP and Kraus US.  The credit facilities consist of a term loan in the principal amount of $4,650,000,[2] an operating facility in the maximum principal amount of $45,350,000 to be used for, among other purposes, working capital requirements ("Wells Operating Facility"), and a $15,000,000 real estate secured term loan.

9.     The Wells Credit Agreement has subsequently been amended on several occasions including most recently pursuant to a fourth amendment to credit agreement dated August 6, 2018.

10.     As of August 31, 2018, the total indebtedness outstanding under the Wells Credit Agreement, as amended, was approximately $48,229,000.

---

[2]     All dollar amounts are stated in Canadian Dollars unless otherwise specified.

28664888.3

11.     The obligations and liabilities pursuant to the Wells Credit Agreement are fully secured by a series of security agreements over all present and after-acquired real and personal property of the Kraus Group.

12.     The Kraus Group is in default of the Wells Credit Agreement and Wells Fargo has demanded payment under the Wells Credit Agreement.  Immediately prior to the commencement of these proceedings the Kraus Group entered into a form of forbearance agreement with Wells Fargo (the "Forbearance Agreement").   The Forbearance Agreement contains many of the standard recitations of acknowledgement of obligations, security interests, and events of default. Additionally, and by way of summary, the agreement is premised on the filing of the CCAA Proceeding and the Chapter 15 Cases and provides, among other things:

   a.     Subject to the terms and conditions of the Forbearance Agreement, Wells Fargo will extend certain credit accommodations to the Kraus Group;

   b.     During the forbearance period, the Kraus Group will operate in accordance with certain agreed upon cash flow projections;

   c.     The Monitor will provide to Wells Fargo updated 13 week statements of cash flow on a weekly basis;

   d.     The Kraus Group shall otherwise cooperate with Wells Fargo;

   e.     During the forbearance period, the Kraus Group will not solicit or enter into DIP financing arrangements;

   f.     During the Forbearance Period a weekly forbearance fee (beginning at $10,000 but dropping after four weeks to $7,500) is payable to Wells Fargo; and

   g.     The failure of the Kraus Group to implement the TPS Purchase Agreement and to use the net sale proceeds to repay the Wells Fargo debt as soon as practicable and in any event by December 14, 2018 is an "Intervening Event" (as such term is defined in the Forbearance Agreement) and is a consequent default of the Forbearance Agreement.

28664888.3

B.     **Junior Secured Debt**

13.     Red Ash Capital Partners II Limited Partnership ("Red Ash"), is the junior secured creditor of the Kraus Group.  Red Ash's general partner is Pinnacle Capital Resources Limited. Hilco UK Limited ("Hilco") is the sole shareholder of Pinnacle Capital Resources Limited.

14.     In May 2012, Hilco acquired the predecessors of the Kraus Group ("Predecessors").  As part of this acquisition, Red Ash took an assignment of the credit facilities and security held by the secured creditors of the Kraus Group's Predecessors ("Assigned Credit Facilities").  Concurrent therewith, Hilco created the Kraus Group and the Kraus Group assumed the debts, liabilities and obligations of its Predecessors under the Assigned Credit Facilities through certain assignment and assumption agreements.

15.     In connection with the acquisition and creation of the Kraus Group, certain of the Predecessors executed and delivered a promissory note dated May 9, 2012, to Red Ash in an amount up to but not exceeding $15 million.  This promissory note was amended and restated by a promissory note dated June 29, 2012, issued to Red Ash by both Kraus Brands LP, by its general partner, Kraus Brands Inc., and Kraus US, in an amount up to but not exceeding $25 million ("2012 Red Ash Promissory Note").

16.     On July 25, 2014, Kraus Canada LP, by its general partner Kraus Canada Inc., Kraus Carpet LP, by its general partner Kraus Carpet Inc., Strudex LP, by its general partner Strudex Inc., and Kraus US, issued a promissory note to Red Ash in an amount up to but not exceeding $10 million.  This promissory note was subsequently amended three times, most recently by a third amended and restated promissory note dated December 29, 2015, in an amount up to but not exceeding $16 million ("2014 Red Ash Promissory Note").

17.     The Kraus Group's debt obligations and liabilities pursuant to the Assigned Credit Facilities, the 2012 Red Ash Promissory Note and the 2014 Red Ash Promissory Note (collectively, the "Red Ash Debt Agreements") are fully secured by a series of security agreements over all present and after-acquired real and personal property of the Kraus Group.

18.     The Red Ash Debt Agreements have a second-ranking security interest in and to all of the Property of the Kraus Group, whether now owned or hereafter-acquired by or on behalf of the Kraus Group, wherever located.

19.     As of August 31, 2018, the total indebtedness outstanding under the Red Ash Debt Agreements was approximately $99,940,956.

### C.     Other Secured Creditors

The Foreign Representative is not aware of any other entities other than equipment lessors that purport to be secured creditors of the Debtors.

### D.     Trade Creditors and Suppliers

20.     Kraus Group has unpaid trade and other unsecured debt accrued in the normal course of business.  As of July 31, 2018 accounts payable balances totaled approximately $32.3 million.

## III.    Financial Position of the Kraus Group

### A.     Kraus Group's Declining Financial Performance

21.     The Kraus Group has operated at a net loss for the past five years and its sales have declined significantly in the past two years.  Consolidated annual net losses for the Kraus Group for the years ended December 2014 to December 2017, and for the seven-month period ended July 31, 2018 are as follows:

28664888.3

| Year | 2014 | 2015 | 2016 | 2017 | 2018 (7 months) |
|------|------|------|------|------|------------------|
| Net Loss (M) | $10.0 | $11.7 | $3.8 | $6.1 | $7.6 |

22.    The Kraus Group's EBITDA has also had a sharp decline since December 2016. The Kraus Group's EBITDA for the years ended December 2014 to December 2017, and for the seven-month period ending July 31, 2018 is as follows:

| Year | 2014 | 2015 | 2016 | 2017 | 2018 (7 months) |
|------|------|------|------|------|------------------|
| EBITDA (M) | ($1.2) | $4.2 | $6.1 | $3.2 | ($0.1) |

23.    There are several reasons for the financial decline.  First, the Kraus Group's performance was negatively impacted by the downturn in the carpet manufacturing industry over the past several years. The downturn was caused by several factors including (i) a consumer preference for hard surface flooring, as a trends move away from broadloom carpet in both residential and commercial markets; (ii) the availability of cheaper broadloom carpeting from the United States and overseas; (iii) and a general decline in carpet sales and profitability over the past 20 years.

24.    As a result of this downturn, the North American carpet manufacturing industry has gone through a significant consolidation with smaller companies closing or being acquired by major manufacturers.

25.    Apart from a general decline in the market, the specific circumstances faced by the Kraus Group contributed to the decline in its fortunes.  As a vertically-integrated producer and distributor of flooring products, the Kraus Group faced significant fixed costs, including those

7

associated with maintaining and operating the Waterloo Premises and a North American-wide distribution network. Those fixed costs could not be reduced or downsized to correspond with an overall decline in market demand.

26. Although the Kraus Group has taken steps since 2008 to cut costs in its manufacturing process, the Kraus Group still has not been able to improve its financial performance or to minimize its mounting debt obligations.

### B. Assets and Liabilities of the Kraus Group

27. As at July 31, 2018, the Kraus Group's unaudited financial position consisted of:

    (a)      assets with a net book value of approximately $133,681,462, including cash and accounts receivable of $24,127,963; inventory of $59,493,825; and property, plant and equipment, net of accumulated depreciation, of $29,350,836;

    (b)      liabilities of approximately $180,445,952, including accounts payable of $32,275,149; other current liabilities of $48,229,292 (being the amount owed pursuant to the Wells Credit Agreement); and long-term debt of $99,940,956; and

    (c)      shareholders' equity (deficit) of approximately ($46,764,490).

## IV. TPS Business Sales Process and Sale Approval

28. In consultation with Kraus Group, Red Ash retained Deloitte Corporate Finance Inc. ("DCF") in March 2018 to explore strategic alternatives for the continuation of their business divisions.

29. In consultation with DCF the Debtors concluded that it was in the best interests of the Debtors and their stakeholders to pursue a sale of the two operating divisions of the

28664888.3

company, the TPS Business and Broadloom Business pursuant to a sales process run by DCF. This process resulted in the execution of the purchase agreement ("TPS Purchase Agreement") for the TPS Business, which is conditional on receipt of approval and vesting order from the Canadian Court and recognition of such approval and vesting order by this Court.  Unfortunately, no going concern purchaser was secured for the Broadloom Business.

30.     By a motion returnable before the Canadian Court on September 18, 2018, the Kraus Group will seek Canadian Court approval of consummation of the transaction contemplated by the TPS Purchase Agreement.   The Foreign Representative has filed or will shortly file a motion (the "Sale Motion") to have the TPS Business sale, to the extent it is approved by the Canadian Court, recognized by this Court.   The Foreign Representative is seeking to have the Sale Motion heard on notice and hearing on the date scheduled for consideration of the final recognition order.

31.     The Kraus Group, with the assistance of DCF, has engaged in a thorough review of its strategic alternatives and has concluded that the execution of the TPS Purchase Agreement and related documents are the best course of action to maximize the value of the TPS Business for the Kraus Group's stakeholders.

32.     DCF conducted broad and fulsome marketing processes for both the TPS Business and the Broadloom Business.

33.     The TPS Purchase Agreement will provide an ongoing customer for suppliers, an ongoing tenant for landlords, and ongoing employment for at least 160 of the Kraus Group's employees.

34.     Concurrent with the Purchase Agreement, the proposed purchaser of the TPS Business will acquire the premises located at 2216 Abutment Road in Dalton, Georgia.

28664888.3

35.     Wells Fargo and Red Ash support the sale of TPS Business.

36.     I am advised by Paul Casey of the Monitor that the Monitor supports the TPS Purchase Agreement and related transactions.

37.     As at August 30, 2018, the Kraus Group remains in discussion with the key supplier with respect to receiving an offer for the Broadloom Business or certain of its assets.

## VI.     RECOGNITION AND OTHER RELIEF REQUESTED

### A.     Recognition of the CCAA Proceeding as a Foreign Main Proceeding

38.     I am informed that in order to be recognized as a "foreign main proceeding," a proceeding must be pending in the country where the debtor has its "center of main interests," which I understand to be the functional equivalent of a headquarters, principal place of business or "nerve center." I believe that the CCAA Proceeding meets this requirement.  As described above, the Debtors are headquartered in Canada where main production occurs and where management of the Kraus Group is located.

39.     In other words, as set forth below, Canada is where the Debtors' principal place of business and "nerve center" is located:

   a.     The Kraus Group's Headquarters and the place where general supervision and management of the Debtors takes place is Waterloo, Ontario, Canada;

   b.     The Debtors' place of strategic control is in Canada with the CEO and all other C-Suite executives and senior management being based in Canada;

   c.     The Group's accounting function is in Canada with the Kraus Group's CFO and Controller based in Canada;

   d.     The Debtors IT systems are based in Canada;

   e.     The Debtors' human resources functions are based in Canada;

   f.     The Kraus Group was founded in Canada;

   g.     The corporate identity and branding of the Group was created in and is largely associated with Canada;

28664888.3

h.      Board meetings are held in Canada;

i.      "Town Hall" meetings of Kraus Group executives and sales
        representatives occur in Canada; and

j.      Negotiations with the Debtors' secured creditors, namely Wells Fargo,
        have taken place in Canada.

Indeed, Kraus US is merely the U.S. sales and distribution arm of the Kraus Group with all

"nerve center" functions conducted in Canada.

**B.      Need for Provisional Relief**

40.      In addition to seeking recognition on a final basis, the Foreign Representative also

requests a provisional stay.  A stay of proceedings against the Debtors and their assets located in

the United States is crucial to preserve key contracts and prevent any creditors of the Debtors

from pursuing remedies and taking other actions that may result in significant erosion in the

value of the Debtors' assets to the detriment of all stakeholders.  It is imperative to the Foreign

Representative's ability to preserve the value of the Debtors' assets that the Foreign

Representative has an opportunity to oversee and pursue the sales process without the

interference and distraction of adverse creditor or contract-counterparty actions.

41.      Without the stay, there is a material risk that contract counterparties, creditors, or

others may take precipitous action detrimental to the Debtors and their creditors as a whole.

The interim stay protections are necessary to prevent any such parties from attempting to

exercise self-help remedies as a result of commencing these Chapter 15 Cases.

**C.      Noticing Procedures**

42.      The Foreign Representative has also filed a motion requesting that the Court

schedule a final recognition hearing and approve related noticing procedures (the "Notice

Procedures Motion").   I can attest that the Debtors have hundreds of creditors, potential

creditors, and other parties in interest, all of whom need to be provided with, among other things,

28664888.3

notice of the provisional order, the proposed final order, the recognition objection deadline, and the recognition hearing.  The Foreign Representative has prepared a form of notice advising of these and related matters (the "<u>Recognition Hearing Notice</u>"), a copy of which is annexed to the Notice Procedures Motion.

43.    Under the facts and circumstances of the Debtors' Chapter 15 Cases, I submit that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide those parties identified as the Notice Parties in the Notice Procedures Motion with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadline and hearing dates.

44.    Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

**D.    <u>Joint Administration and Consolidated Rule 1007(a)(4) List</u>**

45.    The Foreign Representative has also filed, contemporaneously herewith, (i)  a motion seeking entry of an order directing joint administration of these Chapter 15 Cases for procedural purposes only ("<u>Joint Administration Motion</u>") and (ii)  a motion authorizing the Foreign Representative to file a consolidated list of foreign proceeding administrators, parties to litigation pending in the United States involving any of the Debtors, and all persons and entities against whom the Debtors seek provisional relief pursuant to section 1519 of the Bankruptcy Code ("<u>Consolidated Rule 1007(a)(4) List Motion</u>").

46.    Each of the Debtors are direct or indirect subsidiary of their non-debtor parent Red Ash.  I believe that joint administration of these Chapter 15 Cases is warranted because the Kraus Group's financial affairs and business operations are closely related, and because it will ease the administrative burden of these cases on the Court and interested parties.  I can confirm

that the Foreign Representative anticipates that the various notices, motions, hearings, orders, and other pleadings in these cases will affect all of the Debtors.

47. Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest. For substantially similar reasons, the Foreign Representative believes that entry of the Consolidated Rule 1007(A)(4) List Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

28664888.3

I certify under penalty of perjury under the laws of the United States  that the

foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  September 11, 2018

Christopher Emmott